*UNITED STATES DISTRICT COURT*
*DISTRICT OF MAINE*

| | | |
|---|---|---|
| *UNITED STATES OF AMERICA,* | ) | |
| | ) | |
| *v.* | ) | *No. 2:10-cr-123-DBH* |
| | ) | |
| *ROBERT WAYNE INFANTE,* | ) | |
| | ) | |
| *Defendant* | ) | |

*RECOMMENDED DECISION ON MOTIONS TO SUPPRESS*

Robert Wayne Infante, charged with one count of possession of firearms and ammunition by a felon in violation of 18 U.S.C. §§ 922(g)(1) and 924(a), one count of possession of an unregistered destructive device in violation of 26 U.S.C. §§ 5861(d), 5841, 5845(f), and 5871, one count of manufacturing marijuana in violation of 21 U.S.C. § 841(a)(1), one count of possession of a firearm, to wit, a destructive device, in relation to a drug trafficking offense, in violation of 18 U.S.C. § 924(c)(1)(B)(ii), and one count of possession of a firearm, to wit, a revolver, in violation of 18 U.S.C. § 924(c)(1)(A)(i), *see* Indictment (Docket No. 12), seeks to suppress (i) all evidence secured as a result of a warrantless search of his home in Alfred, Maine, by firefighters on June 25, 2010, *see* First Motion To Suppress Evidence ("First Motion") (Docket No. 24) at 1, and all statements that he made during the course of an interview conducted principally by Daniel Young of the Maine Fire Marshal's Office at Southern Maine Medical Center ("SMMC") in Biddeford, Maine, the same day, *see* Second Motion To Suppress Evidence ("Second Motion") (Docket No. 25) at 1.

An evidentiary hearing was held before me on December 2 and 3, 2010, at which the defendant appeared with counsel. The government tendered eight witnesses and offered two exhibits, which were admitted without objection. The defendant tendered no witnesses and

offered 13 exhibits, which were admitted without objection.[1]  After both sides rested, counsel for each argued orally.  I now recommend that the following findings of fact be adopted and that both motions be denied.

## I.  Proposed Findings of Fact

### A.  Evidence Relevant to First Motion

At approximately 8:50 a.m. on June 25, 2010, the defendant, sounding agitated and breathing heavily, placed a 911 call stating that he needed an ambulance.  *See* Transcription re: Robert Infante 911 call ("911 Transcript"), Dft's Exh. 1, at 1.[2]  He explained that he had just taken off the tip of his finger and about an inch on the side of his hand when "[a] propane tank went off on me." *Id.*  In response to a dispatcher's question, he affirmed that he was home alone at the scene of the emergency, 60 Avery Road in Alfred, Maine.  *See id.*  He added that "a small little hand-held propane tank exploded on me." *Id.* at 2.  In response to the question whether anything was still burning or smoldering, he stated: "No, it just went bang big time." *Id.* at 3.

He affirmed that he was safe and out of danger, outside of the house, and that no clothing was burning or smoldering.  *See id.* at 4.  The dispatcher told him that help was on the way and asked him not to move unless it was absolutely necessary.  *See id.*  The defendant stated that he was just going to take care of things that he needed to take care of and secure his house because he was not going to be there.  *See id.*

At approximately 8:53 a.m., the Sanford Communications Center, a regional communications center for Alfred and other towns ("Sanford Dispatch"), broadcast the following

---

[1] The government conditioned its lack of objection to the admission of Defendant's Exhibits 9, 11, 12, and 15 on the parties' stipulation that those photographs were taken after 8:30 p.m. on June 25, 2010.

[2] The defendant offered into evidence an audio disc of his 911 calls, related dispatch communications, and interviews at SMMC, *see* Dft's Exh. 17, as well as transcripts of all of those recordings, *see* Dft's Exhs. 1-2, 5.  In setting forth these proposed facts, I have relied not only on the transcripts but also on information gleaned from listening carefully to the underlying recordings.

bulletin: "Sanford ME with a fire and rescue for Alfred, 60 Avery Road for a propane explosion. Male with a large cut, finger amputated. . . . Male, by himself has a large cut, and finger amputated." Transcription re: Sanford Dispatch Robert Infante Call ("Sanford Dispatch Transcript"), Dft's Exh. 2, at 1. The Alfred Fire Department responded, inquiring whether there was any fire and any structure involved. *See id.* Sanford Dispatch replied, "None that I'm seeing, doesn't list anything, just a propane explosion, and the finger amputation." *Id.* Sanford Dispatch did not relay the information that the explosion reportedly had been caused by a small propane tank. At all relevant times, communications both to and from Sanford Dispatch were broadcast to fire and rescue personnel. However, fire and rescue personnel never heard the underlying 911 calls.

The Sanford Dispatch bulletin was heard at the Alfred fire station by George Donovan, a 48-year veteran of the Alfred Fire Department, and Andrew Stevenson, a firefighter paramedic who works full-time for the City of Biddeford, Maine, but was on his first day on the job as a part-time paramedic for the Alfred Fire Department and was receiving orientation from Donovan.

Stevenson checked a map to locate the address in question, with which neither he nor Donovan was familiar, donned his firefighting gear, and departed in an ambulance, Alfred Rescue One, toward 60 Avery Road by way of Gore Road. Donovan also donned his firefighting gear and followed in a fire engine, Alfred Engine Two. Both activated their sirens and flashing lights. According to dispatch records, they were *en route* by 8:56 a.m. *See id.* at 2. About a minute later, Alfred Fire Department Lieutenant Marc Cunningham, referred to in the transcript as "Alfred C7," who had heard the dispatch call for help from his home, radioed Sanford Dispatch that he, too, was *en route*. *See id.* Cunningham was the highest ranking Alfred Fire

3

Department official involved in the response to the 911 call that day. Greg Roussin, another Alfred Fire Department volunteer firefighter who had heard the Sanford Dispatch bulletin while at home, also headed to 60 Avery Road by way of Gore Road in his personal vehicle.

At approximately 9:00 a.m., the defendant again phoned 911, advising that he was going to the hospital himself because rescue was taking too long. *See* 911 Transcript at 5. After Cunningham turned onto Avery Road, a rural dirt road with few houses, he saw a vehicle pass him going the opposite direction at a high rate of speed, being chased by a dog. While still on Gore Road, Roussin, who was behind Cunningham, passed a vehicle headed in the opposite direction that he guessed was that of the 911 caller because the driver had one hand on the steering wheel and the other cradled in a rag.

Cunningham arrived at 60 Avery Road and radioed Sanford Dispatch that he was on the scene. *See* Sanford Dispatch Transcript at 4. Sanford Dispatch broadcast a bulletin that the 911 caller had left the area and was *en route* to Gore Road and SMMC. *See id.*

Stevenson, who was by then traveling on Gore Road, heard the Sanford Dispatch broadcast at about the same time as he saw a lone male drive past him in the opposite direction with four-way hazard lights flashing. He suspected this was the 911 caller and so advised Sanford Dispatch, which informed him that dispatchers had the caller on the phone and were trying to persuade him to pull over so that Stevenson could attend to his hand. *See id*. The driver, who was the defendant, pulled over, and Stevenson turned the ambulance around and pulled it behind him.

Donovan, who had overheard this radio traffic, radioed Cunningham to ask if any fire was showing at 60 Avery Road. *See id*. Cunningham responded: "[n]egative." *Id*. Donovan stated that he was turning around to assist Stevenson. *See id*.

The defendant exited his car and informed Stevenson that he needed a tourniquet. Stevenson stated that he would not give him a tourniquet until he had looked at his hand. Stevenson observed that the defendant was wearing shorts and shoes but no shirt, had a number of superficial gunpowder- or birdshot-like wounds on his chest, had one hand wrapped in a bloody towel, and seemed anxious, like anyone who was experiencing a traumatic injury, albeit coherent. Stevenson suggested that the defendant get into the ambulance, and the defendant did so. At about that time, Donovan joined Stevenson and the defendant.

Stevenson unwrapped the towel and saw that the defendant was missing the top of the middle finger of his left hand. The defendant had also sustained a deep cut between his thumb and index finger. Bleeding was mostly controlled. As Stevenson was bandaging the defendant's wounds, he asked how the injury had occurred. The defendant said that he was filling up a butane lighter, and the lighter exploded. He told Stevenson once or twice that this had occurred inside his residence.[3] Stevenson urged the defendant to permit him to transport him *via* ambulance to Maine Medical Center in Portland, which was best equipped to handle trauma of the sort the defendant had experienced. Stevenson was concerned that because of the defendant's agitation and the possibility that he could go into shock or lose consciousness, he posed a danger to himself or the public if he continued to drive. The defendant adamantly refused transport by ambulance, stating that he was going to drive himself to SMMC.

At approximately that time, Robert Plumpton, an Alfred Fire Department volunteer firefighter who had heard the Sanford Dispatch call while at home, came upon the defendant's car, the ambulance, and the fire engine as he drove his personal vehicle on Gore Road toward 60

---

[3] Donovan testified that he (Donovan) asked the defendant twice where the explosion occurred and whether it had happened outside in the yard, but he got no clear answer.

Avery Road. He pulled his vehicle behind the others, got out, and walked up to the ambulance, where he overheard Stevenson exhorting the defendant to accept ambulance transportation.

The defendant asked Stevenson what would happen to his car if he agreed to be transported by ambulance – specifically, whether it would be towed. Stevenson responded that it might be towed but that arrangements might be able to be made for someone to drive it back to the defendant's residence. There was some discussion of the possibility of Plumpton's driving the defendant's car.

The defendant stated that no one could drive his car or return to his residence, explaining that he had a loose wolf on the property, which Stevenson understood to be a wolf-dog. Stevenson then advised that, if the defendant insisted on driving himself, he take himself to Goodall Hospital in Sanford, Maine, which was closer than SMMC. The defendant adamantly refused to do so, citing a dispute he had had with Goodall.

Before the defendant left, Stevenson tried one last time to persuade him not to drive himself to the hospital, warning him of the risks of doing so. The defendant indicated that he understood those risks and proceeded to exit through the side door of the ambulance past Donovan, get into his car, and drive away.[4] He had been with Stevenson for a total of about eight minutes. Stevenson radioed Sanford Dispatch to report that his patient had adamantly refused transport and signed off AMA, or against medical advice, and that he was returning to the fire station. *See id*. at 5. When he returned, he called SMMC to apprise staff there of the situation.

---

[4] Donovan testified that as the defendant left the ambulance, he shoved Donovan off the bottom step, swore at him, and told him that he was going to Southern Maine Medical Center. Neither Stevenson nor Plumpton recalled witnessing that interaction. I need not resolve the discrepancy, which has no bearing on the outcome of this recommended decision.

When Cunningham arrived at 60 Avery Road, he checked the exterior of the defendant's house looking for signs of a fire or explosion, and found none. He walked about 25 feet into the woods behind the house, to the site of a fire pit, and five to 10 feet out from the sides of the house. He determined that the exterior doors to the house were locked. He heard a hissing sound that concerned him given the reported explosion. Roussin, Plumpton, and Donovan arrived, in that order, shortly thereafter. Upon arrival, Roussin and Plumpton donned their firefighting gear. Donovan told Cunningham that he had asked the defendant if the explosion had happened inside or outside of the house and could not get a straight answer from him.

From the time of their respective arrivals at 60 Avery Road to the time they entered the residence, none of the four firefighters observed evidence of an explosion of any kind, a fire, smoke, or a propane tank as they walked around the perimeter of the residence. There was no evidence of damage to the house, and no sign of the presence of another person.

Upon his arrival, Plumpton observed a loose dog barking and a school bus, but no other vehicle, parked in the driveway. Donovan observed that the school bus did not appear to be registered or driveable. As Plumpton walked on the driveway, he observed an item that he described as a cigarette lighter lying on the ground. Roussin observed that the lighter was broken but did not appear to have exploded and that there was no blood or human tissue near it. Cunningham did not see the lighter. Plumpton observed containers filled with fireworks in the parked school bus. Cunningham either noted or was informed about the presence of the fireworks in the bus.

Cunningham radioed Sanford Dispatch to request that an animal control officer be sent to contain the loose dog so that firefighters could secure the residence. *See id*. at 6. He also radioed Stevenson to verify that the defendant had stated that the explosion occurred inside the

house.  *See id*.  Stevenson affirmed that he had.  *See id*.  Cunningham learned from Stevenson, Donovan, or both that the defendant had stated that a butane lighter had exploded in his hand.

The firefighters did not enter the house until an animal control officer had arrived and contained the loose dog, a process that took about 25 to 30 minutes from the time that Cunningham placed the call.  There was no observable change in the exterior of the house or its surroundings during that time.

As Plumpton assisted the animal control officer, Cunningham, Roussin, and Donovan walked up onto a side porch of the house, and Donovan looked through a window into what appeared to be a living room.  The window was open, albeit covered by a screen, and the wind was blowing the curtains.[5]  Donovan saw a trail of blood on the floor, starting at a door that he presumed led to the cellar.  He had seen no blood on the porch or on the steps leading up to the porch.  Upon peering into the window, he did not see or smell any signs of smoke or fire. Roussin and Cunningham also looked through the same window.  Both observed blood on the floor.  The blood drops appeared to Cunningham, Donovan, and Roussin to be consistent with the defendant's reported injuries.  Roussin also heard a hissing sound, which he told his companions he thought was running water.

Cunningham, who made the official decision to enter the house, considered it his obligation to do so to search for the source of the explosion.  In a similar vein, Donovan testified

---

[5] On direct examination, Donovan described the curtains as not only partway open but also transparent.  On cross-examination, he admitted that Defendant's Exhibit 12, a photograph of the interior of the defendant's living room that was admitted with the stipulation that it was taken considerably later the same day, depicts a dark curtain or window treatment covering the window at issue.  However, he testified that the window either lacked that covering or that the covering was blowing in the wind in such a way as to permit a clear sight of the living room when he looked through the window.  On cross-examination, Donovan, Roussin, and Cunningham all testified without hesitation or doubt that they were able to see into the house through the window in question and in fact saw blood drops on the floor.  I am satisfied that, regardless of the exact nature of the window covering, it was sheer enough and/or the wind was blowing the covering in such a manner as to enable the firefighters to see the blood drops on the floor.

that firefighters decided to enter the house because it was apparent that the explosion had occurred there and because they had to ensure that there was no chance of further fire or explosion and that no one else was present on the premises.[6] Roussin testified that firefighters went in mainly to see whether anyone else was hurt, whether there was a possibility of a secondary explosion, or whether there was a fire. Plumpton testified that, despite a lack of objective indicia at the site of any fire or explosion, he would not have been comfortable simply leaving without further investigation because, in view of the 911 report of a propane explosion and the defendant's serious injuries, some kind of explosion obviously had happened.

Donovan popped the screen from the frame of the open window, and Cunningham crawled through the window into the house and unlocked the door, through which Donovan, Roussin, and Plumpton, who by then had rejoined his colleagues, entered. There was no smell or sign of smoke or fire. Upon entering, Cunningham verified that the hissing noise was caused by water running from a bathroom faucet, which he turned off. Plumpton smelled a strong odor of marijuana. Roussin smelled a sweet smell and saw the glow of lighting in the cellar. Donovan called out to see if anyone else was in the house, and no one answered.

The firefighters followed the trail of blood from a bathroom to a cellar door and downstairs to the cellar, observing droplets of blood on the cellar steps as they descended. Upon reaching the bottom of the stairs, Cunningham, who was in the lead, turned and immediately observed a number of what appeared to be marijuana plants, together with growing equipment. There was no visible sign or smell of a fire in the cellar.

Cunningham instructed Roussin, who was bringing up the rear, to go out and obtain a camera from the fire engine, and Roussin did so. By the time Cunningham gave this direction,

---

[6] Donovan testified that he had asked the defendant, while in the ambulance, whether there was anyone else in the house and never got an answer.

he knew that there was no fire in the house and that no one else was present there. Cunningham advised the remaining firefighters to continue to search for the source of the explosion and not to touch the plants. Roussin returned with the camera and joined in the search. As Donovan searched, he stepped on an object on the floor that looked like an upside down hubcap. He picked it up and found what appeared to be three pipe bombs. While he was able to recognize the pipe bombs based on his training, neither he nor the other firefighters present was trained or experienced in handling or disarming bombs. Roussin took photographs of the plants and the apparent pipe bombs, and the firefighters departed the residence. They seized nothing from the cellar. Before leaving the house, where they had been for a total of no more than 10 minutes, the firefighters did not find the source of the reported explosion.

Using his cell phone to avoid a public broadcast, Cunningham called Sanford Dispatch and requested backup from a state trooper and the state fire marshal's office. Individuals from those agencies eventually arrived and toured the cellar. The state fire marshal's office investigator ordered the surrounding area evacuated and called an ambulance as backup prior to arranging for the disposal of the suspected pipe bombs.

### B. Evidence Relevant to Second Motion

At about 9:26 a.m. on June 25, 2010, Daniel Lee Young, an investigator for the state fire marshal's office and 25-year veteran of the Portland Police Department, received orders from one of his supervisors, Sergeant Ken Grimes, to travel to SMMC to investigate a subject injured in a propane explosion. When Young arrived at the SMMC emergency room at approximately 10:30 a.m., he encountered another law enforcement officer waiting to interview the defendant, Maine Drug Enforcement Agency ("MDEA") agent Paul Shaw. Both Young and Shaw were in plainclothes. Young had a visible badge on his belt, and both Young and Shaw were wearing

guns. Young interviewed the defendant at SMMC twice that day, conducting an initial interview that lasted about 26 minutes and a second interview that lasted about 21 minutes. At no point during either interview did Young read the defendant his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966).[7]

The first interview occurred at about 11:30 a.m., when Young and Shaw were shown into a treatment room in the emergency room in which the defendant was lying in a bed with his bandaged hand elevated. Emergency room staff had completed an initial assessment and treatment and had administered morphine to the defendant to control his pain while he awaited hand surgery.

As Young and Shaw entered the room, Young turned on a tape recorder and informed the defendant that he was recording their conversation. The door to the treatment room was closed, although Young could not recall whether he or Shaw closed it or whether it was self-closing. Young stood at the foot of one side of the defendant's hospital bed, between the defendant and the door to the room, and Shaw primarily sat in a chair on the other side of the bed. Young's gun and badge, which were at hip level, would have been clearly visible to the defendant. Young did not recall any hospital personnel entering the room during the first interview. Grimes briefly entered the treatment room.

Throughout the first interview, the defendant was coherent, responsive, and did not appear impaired or otherwise under the influence of any substance. He was not handcuffed or restrained in any way, and neither Young nor Shaw touched him or otherwise restricted his movement in any way. The defendant noted at one point that his hand hurt, and he requested

---

[7] Pursuant to *Miranda*, an accused must be advised prior to custodial interrogation "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Miranda*, 384 U.S. at 478-79.

additional morphine, but he lay quietly in bed and did not appear to Young or Shaw to be in anguishing pain. After introducing himself and Shaw, Young told the defendant:

> This is your voluntary statement. You don't have to give it to me, you don't have to talk to me if you don't want to. You're in a hospital bed. Obviously you can't leave. You have some serious hand injuries. So, we're giving you the opportunity to talk with us if you want. There's a couple things I want to ask you about. . . . Ok, and again this is all voluntary. You're not in custody. You're not under arrest at this point. Ok. But I need to know a couple of things.

Transcription re: Robert Infante interview w/Danny Young, State Fire Marshal's Office ("Young Interview Transcript"), Dft's Exh. 5, at 1. He began asking the defendant questions about a wired battery that had been observed in the back seat of his car in the SMMC parking lot, raising sufficient concern to cause the parking lot to have been secured, and sought consent to search the defendant's car. *See id*. at 1-2. He explained that officers were concerned about the battery because, among other things, of some things found in the defendant's home. *See id*. at 2. The defendant asked why and how police got into his house, but gave his consent to search the car. *See id*. He denied knowledge of the whereabouts of his car keys. *See id*. Young asked some additional questions about the battery and the car, and the following conversation ensued:

> Y[oung:] . . . [D]o you want to tell us at all, again, totally voluntary, at this point you're not under arrest, you're not in custody.
>
> I[nfante:] Well you've already raided the hell out of the house, what's the sense of talking to you?
>
> Y[oung:] I want to ask, well because.
>
> Sgt Ken Grimes[:] Two sides to every story.
>
> Y[oung:] Exactly. You've got an injury to your hand obviously. We have to investigate that. If you want to. This is your chance to be honest with us and to talk to us about it. You don't have to obviously, voluntary. But, if you'd like to, we'd love very much to hear from you.
>
> I[nfante:] Well, since you've already been in my house,

Y[oung:]        Yeah

I[nfante:]      I may as well just plead the 5th and go for a lawyer.

Y[oung:]        Ok.  Very good.[8]

G[rimes:]       Do you have a second?

S[haw:]         I do.[9]

Y[oung:]        That will be fine.  And that's totally your.  But apparently, and I
                don't know, I wasn't at the scene, I was sent directly here to talk to
                you.  But apparently um,

I[nfante:]      I'll take it that you guys are going to charge me now.

Y[oung:]        Well, ATF [the Bureau of Alcohol, Tobacco, Firearms and
                Explosives] is on the way down as well as the bomb squad, and
                umm, and MDEA obviously for marijuana plants.

I[nfante:]      I'd just like to know how the hell you guys get into my house.

Y[oung:]        Well, I think what happens is, the fire department goes in under
                what they call exigent circumstances because of some kind of
                explosion or something that occurred which they have every right
                to do.  And when they make observations when they're in there
                doing that, and then they call the appropriate authorities, which is
                us.  So that's how we get into your house.  **** wants a lawyer.

I[nfante:]      I mean, what else is there to say?

Y[oung:]        Sir, let me explain this to you.  Ok.  You've been through this
                twice before from what I'm understanding.[10]  All I'm saying to you
                is this.  I'm here and I need to find out what happened.  You've
                already asked for an attorney, I can't talk to you any further unless
                you revoke that, and say you want to explain things to me.

I[nfante:]      What is there to explain?  Well we've still got the tape recorder
                going[.]

---

[8] Young, who made notes during the interview, wrote: "Pled 5th[.]  Wants a lawyer 11:36[.]"  Dft's Exh. 27.
[9] Shaw left the treatment room briefly with Grimes, closing the door behind him.  He reentered the treatment room shortly thereafter.
[10] On cross-examination, Young agreed that this was a reference to the defendant's prior criminal history.

| | |
|---|---|
| Y[oung:] | Absolutely. I will not take that off. |
| I[nfante:] | There's nothing to explain. |
| Y[oung:] | Well, we understand there may be some bomb making, some pipe bomb making material in there, as well as marijuana plants. My, my question to you is if you're able to, so \*\*\* you can't talk to me, I can't elicit any responses from you unless you take that back. But if you wish to do it, I'll stand here and listen to you. But I guess what I'm trying to do is, what the heck's going on, and how did you do that. That's where I have to write my report as to how you damaged your hand. If you don't want to tell me fine. You've already asked for an attorney. |
| I[nfante:] | OK. How I did this? |
| Y[oung:] | First of all, let me explain something. Do you wish to talk to me now, without |
| I[nfante:] | Yeah, I'll talk to you. |
| Y[oung:] | And waive the right to an attorney. |
| I[nfante:] | I may as well give the information that you're looking for. |

*Id.* at 4-6. Later in the interview, after Young began to ask the defendant about pipe bomb materials that might be present in his home, the defendant asked: "[I]s there any way I can have a cigarette real quick?" *Id.* at 11. Young replied, "Not in here because they have oxygen." *Id.* Shaw added: "I don't even think right on hospital property you can anymore." *Id.*

The first interview concluded at about 11:54 a.m., after the defendant asked for more medications for his hand. *See id.* at 18. Young turned off the recorder, then went outside to meet with Grimes and a Maine State Police bomb squad specialist with respect to the defendant's car. The defendant invited Shaw back into the room, and the two engaged in small talk. Shaw left either before or shortly after the start of the second interview.

At about 1:06 p.m., Young returned to the defendant's treatment room, again activating his tape recorder. He asked the defendant if he would permit investigators to take custody of his

14

clothing, which a nurse was about to remove, stating: "Well, you have the right not to, I mean, like I said, you're not under arrest. You're not, right now, I'm sure at some point you probably will be. But right now you're not under arrest, you're not in custody. Our main focus right now is you getting your hand fixed. Ok. So that's why." *Id*. at 19. The defendant agreed to give Young his clothes. *See id*. Young phoned investigator Ken McMaster, who was out in the parking lot, and McMaster, who also was in plainclothes, came to the treatment room to collect the clothes. At one point, Young asked the defendant how he was feeling, and the defendant said that he was thirsty and wanted ice chips with water. *See id*. at 22-23. Young called the request to the attention of a nurse, who discussed it with the defendant. *See id*. at 26.[11]

Young observed no change in the defendant during the second interview. Again, Young did not touch the defendant or restrain his freedom of movement in any way. Hospital personnel came and went during the interview. The second interview ended at 1:27 p.m.

The hospital posted a security guard in the hallway across from the defendant's treatment room. However, Young did not ask that the security guard be there, and the guard was not visible from the defendant's hospital bed. A uniformed Biddeford police officer was stationed outside in the parking lot. However, the parking lot was not visible from the defendant's treatment room. At no point during the interviews did the defendant ask Young, Shaw, or any other law enforcement officer to leave the room. At a few points during both the first and second interviews, the defendant joked with investigators. *See, e.g., id*. at 8, 19, 25-26.

Medical records reflect that the defendant was administered morphine injections at 9:51 a.m., 10:12 a.m., and 12:47 p.m. and a lidocaine injection at 10:10 a.m. *See* Dft's Exh. 6 at 166. The defendant underwent surgery from approximately 2:22 p.m. to 3:45 p.m. *See id*. at 174. A

---

[11] The nurse is identified in the transcript as "HS," or Hospital Staffer.

doctor who assessed the defendant in the emergency room noted that he was alert and oriented. *See id.* at 153.

Although the defendant told Young during the initial interview that he did not know where his keys were, investigators eventually found the keys underneath a bush near the Emergency Department entrance. An SMMC video shows the defendant hiding his keys in the bushes just prior to entering the hospital.

## II. Discussion

### A. First Motion

In his first motion to suppress, the defendant challenges the lawfulness of firefighters' initial warrantless entry into his residence on June 25, 2010, seeking to suppress not only observations made and photographs taken at that time but also, as fruit of the poisonous tree, evidence seized in subsequent searches of his home and vehicle. *See* First Motion at 1.[12]

The government does not dispute that Fourth Amendment protection pertains to firefighters' as well as police officers' warrantless entries of homes. *See* Government's Objection to Defendant's First Motion to Suppress Evidence ("Objection/First Motion") (Docket No. 28) at 4-8; *see also, e.g., Michigan v. Tyler*, 436 U.S. 499, 506 (1978) ("[T]here is no diminution in a person's reasonable expectation of privacy nor in the protection of the Fourth Amendment simply because the official conducting the search wears the uniform of a firefighter rather than a policeman, or because his purpose is to ascertain the cause of a fire rather than to look for evidence of a crime[.]").

---

[12] "Under the 'fruit of the poisonous tree' doctrine, all evidence derived from the exploitation of an illegal search or seizure must be suppressed, unless the Government shows that there was a break in the chain of events sufficient to refute the inference that the evidence was a product of the Fourth Amendment violation." *United States v. Rivas*, 157 F.3d 364, 368 (5th Cir. 1998). During the defendant's hearing, his counsel clarified that the First Motion rises and falls on the lawfulness of firefighters' initial entry. The defendant does not challenge, other than as fruit of the poisonous tree of the initial entry, later entries of his residence, including entries by the state trooper and the fire marshal investigator.

The government bears the burden of demonstrating the validity of a warrantless search or seizure. *See, e.g., United States v. Longmire*, 761 F.2d 411, 417 (7th Cir. 1985) ("The general federal rule on who bears the burden of proof with respect to an allegedly illegal search or seizure is based upon the warrant-no warrant dichotomy: If the search or seizure was effected pursuant to a warrant, the defendant bears the burden of proving its illegality; if the police acted without a warrant, the prosecution bears the burden of establishing legality.").

To meet that burden in this case, the government invokes the so-called "emergency doctrine" exception to the warrant requirement, a subcategory of the larger doctrine of "exigent circumstances." *See* Objection/First Motion at 4-5; *see also, e.g., United States v. Beaudoin*, 362 F.3d 60, 66 (1st Cir. 2004), *vacated and remanded on other grounds sub nom. Champagne v. United States*, 534 U.S. 1102 (2005) ("[W]arrantless entries are most often justified by 'exigent circumstances,' the best examples being hot pursuit of a felon, imminent destruction or removal of evidence, the threatened escape by a suspect, or imminent threat to the life or safety of the public, police officers, or a person in residence.") (citation, internal quotation marks, and emphasis omitted).

In this circuit, the test for determining exigent circumstances "is whether there is such a compelling necessity for immediate action as will not brook the delay of obtaining a warrant." *United States v. Almonte,* 952 F.2d 20, 22 (1st Cir. 1991) (citation and internal quotation marks omitted). For example, "[a]n officer's *reasonable* belief that the delay needed to obtain a warrant would pose a threat to police or the public safety is sufficient to create exigent circumstances." *Fletcher v. Town of Clinton,* 196 F.3d 41, 49 (1st Cir. 1999) (citation and internal quotation marks omitted) (emphasis in original).

The "standard of reasonableness is comparatively generous to the police in cases where potential danger, emergency conditions or other exigent circumstances are present." *Id.* (citation and internal quotation marks omitted). Analysis of exigent circumstances is fact intensive; after all, the "exceptions – by their very nature – turn upon the objective reasonableness of *ad hoc, fact-specific* assessments contemporaneously made by government agents in light of the developing circumstances at the scene[.]" *McCabe v. Life-Line Ambulance Serv., Inc.,* 77 F.3d 540, 545 (1st Cir. 1996).

"Generally, under the emergency doctrine, there must be a reasonable basis, sometimes said to be approximating probable cause, both to believe in the existence of the emergency and to associate that emergency with the area or place to be searched." *Beaudoin*, 362 F.3d at 66 (footnote omitted). "The analysis must be with reference to the circumstances confronting the officer, including, as one commentator has put it, the need for a prompt assessment of sometimes ambiguous information concerning potentially serious consequences." *Id.* (citations and internal quotation marks omitted).

At hearing, counsel for the government argued that firefighters lawfully entered the defendant's residence to determine the source of the original explosion and to satisfy themselves that there was no danger of a secondary explosion. She identified, *inter alia*, the following as objective facts reasonably known to the four firefighters present at 60 Avery Road before they made their initial entry:

1.      That the defendant had called 911, suggesting the existence of an emergency;

2.      That the defendant reported a propane explosion and significant personal injury, a finger amputation;

3.      That the defendant refused treatment from Stevenson and told a different story as to the source of his injuries, stating that they were caused by the explosion of a butane lighter, raising suspicion and concern as to what might be going on at his residence;

4.      That the defendant reported to Stevenson, and Stevenson relayed to Cunningham, that the explosion occurred within the residence;

5.      That there was no obvious sign of an explosion, smoke, debris, or blood outside the residence, warranting entry of the residence to determine the source;

6.      That officers heard a hissing noise coming from inside the residence, which may or may not have been running water, and, if running water, might have been left on by a person remaining in the residence but incapacitated; and

7.      That firefighters observed a visible blood trail upon peering through the window, reinforcing the belief that the source of the explosion and injury would be found inside.

She reasoned that, in these circumstances, it would have been irresponsible of the firefighters not to enter the house to determine the source of the explosion that caused the defendant's obvious injuries and that, therefore, exigent circumstances justified entry without a warrant.  She analogized the instant case to *United States v. Finnigin*, 113 F.3d 1182 (10th Cir. 1997), in which the court rejected a defendant's assertion that firefighters unlawfully entered his home after he had extinguished a fire, ending any exigency.  *See Finnigin*, 113 F.3d at 1185 ("[T]he Supreme Court in *Tyler* rejected the notion that the exigency justifying a warrantless entry to fight a fire ends with the dousing of the last flame. . . .  Fire officials are charged not only with extinguishing fires, but with finding their causes.  Prompt determination of the fire's origin may be necessary to prevent its recurrence[.]  For this reason, fire officials need no

warrant to enter and remain in a building for a reasonable time to investigate the cause of a blaze after it has been extinguished.") (citations and internal quotation marks omitted).

In rebuttal, defense counsel argued that:

1. The emergency doctrine does not dispense with the necessity to establish probable cause, albeit probable cause as to the existence of the emergency rather than of the commission of a crime, a proposition for which he cited Judge Lipez's dissent in *Beaudoin*. *See Beaudoin*, 362 F.3d at 80 ("Whether articulated as a reasonable belief or a probability, the probable cause element of the emergency doctrine requires the same heightened standard that applies to other warrantless searches and seizures in a private residence where the object of the search and seizure is criminal activity. However, under the emergency doctrine, the separate elements of exigent circumstances and probable cause come together. In other words, probable cause in the emergency context focuses on the threat to an individual's life or safety – that is, on the exigency itself. Unless the objective basis for suspicion of an emergency rises to the level of probable cause, a warrantless residential search or seizure violates the Fourth Amendment.") (Lipez, J., dissenting).

2. The only emergencies cognizable under the emergency doctrine are threats to public safety, police safety, or the safety of an individual in a residence, not emergencies implicating potential property damage, a proposition for which he cited both Judge Lipez's dissent in *Beaudoin* and the First Circuit's listing of examples of exigent circumstances, *see, e.g., id*. at 66.

He contended that the government fell short of meeting these standards in view of:

1.     The lack of any objective indicia at the defendant's home of the presence of an explosion or fire, the hissing noise having been observed by Roussin to be the sound of running water;

2.     The lack of any objective reason to believe that anyone was in the defendant's house, given the Sanford Dispatch report that the defendant had been alone, the firefighters' knowledge that the defendant had driven himself to SMMC, and the lack of any driveable vehicle parked in his driveway;

3.     The lack of any evidence as to the proximity of neighbors' homes, coupled with the evidence that Avery Road was in a rural area with few houses;

4.     Conflicting evidence as to whether the explosion occurred inside or outside the residence, with the defendant not having specified the location during the 911 call and having given Donovan an equivocal response;

5.     The firefighters' failure to rule out other obvious possible sites of the explosion, including the parked school bus containing fireworks or wooded areas beyond those searched by Cunningham;

6.     The lack of any evidence as to the likelihood of a secondary fire or explosion in either of the possible scenarios of which firefighters were aware: that the defendant's injuries had been caused by a small propane tank explosion or had been caused by a butane lighter explosion; and

7.     The consistency of the blood droplets with the defendant's injuries, suggesting that no one else was present in the home and that there was no ongoing emergency, the defendant having driven himself to SMMC.

Defense counsel distinguished *Finnigin* on grounds that, in that case, there had been a visible fire and, therefore, evidence of an ongoing process, whereas, in this case, there was none. He reasoned that whereas, in *Finnigin*, the existence of an ongoing process justified firefighters in entering the suspect's house to ensure that the process (the fire) had been extinguished, in this case, firefighters only speculated, in the face of a lack of objective evidence, that any such process had transpired or was continuing to transpire in the defendant's house.

The defendant construes First Circuit caselaw too narrowly in arguing that the emergency doctrine in no circumstance encompasses threats to property. The First Circuit itself has clarified that its list of examples of exigent circumstances "is not an exclusive compendium[.]" *United States v. Martins*, 413 F.3d 139, 146-47 (1st Cir. 2005). It has recognized that, pursuant to the emergency doctrine, "the police, in an emergency situation, may enter a residence without a warrant if they reasonably believe that swift action is required to safeguard life *or* prevent serious harm." *Id*. (emphasis added). Other United States circuit courts of appeals have expressly recognized that, pursuant to the emergency doctrine, the prevention of destruction to property can justify warrantless entry of a residence. *See, e.g., Hunsberger v. Wood*, 570 F.3d 546, 555 (4th Cir. 2009) (emergency-doctrine inquiry is whether circumstances known to officer "would create an objectively reasonable belief that an emergency existed that required immediate entry to render assistance or prevent harm to persons or property within") (citations and internal quotation marks omitted); *Sheik-Abdi v. McClellan*, 37 F.3d 1240, 1244 (7th Cir. 1994) (same). *See also, e.g., United States v. Lawlor*, 324 F. Supp.2d 81, 86 (D. Me. 2004) ("[W]hen policemen, firemen or other public officers are confronted with evidence which would lead a prudent and reasonable official to see a need to protect life or property, they are authorized to act

on that information, even if ultimately found erroneous.") (citation and internal punctuation omitted).

More importantly, the Supreme Court has recognized that, with respect to the firefighting function in particular, the need to enter a burning building and to remain for a reasonable period of time thereafter to determine the cause of the blaze on its face presents an exigency of sufficient proportions to justify warrantless entry. *See, e.g., Michigan v. Clifford*, 464 U.S. 287, 293 (1984) ("A burning building of course creates an exigency that justifies a warrantless entry by fire officials to fight the blaze. Moreover, in *Tyler* we held that once in the building, officials need no warrant to remain for a reasonable time to investigate the cause of the blaze after it has been extinguished. . . . The aftermath of a fire often presents exigencies that will not tolerate the delay necessary to obtain a warrant or to secure the owner's consent to inspect fire-damaged premises. Because determining the cause and origin of a fire serves a compelling public interest, the warrant requirement does not apply in such cases.") (citation, footnotes, and internal quotation marks omitted). In so holding, the Court did not deem it necessary to parse whether the danger posed was to persons, property, or both.

Of course, in this case, as defense counsel repeatedly emphasized, the defendant's house was not ablaze. Indeed, firefighters found no indicia whatsoever of an explosion or fire. Nonetheless, I conclude that the government has met its burden of demonstrating that there was "a reasonable basis, . . . approximating probable cause, both to believe in the existence of [an] emergency and to associate that emergency with the area or place to be searched." *Beaudoin*, 362 F.3d at 66 (footnote omitted).

The First Circuit has observed:

Probable cause exists when [firefighters], relying on reasonably trustworthy facts and circumstances, have information upon which a reasonably prudent person

> would believe [that an emergency exists and is associated with the area or place to be searched]. The inquiry into probable cause focuses on what the [firefighter] knew at the time of the [entry], and should evaluate the totality of the circumstances. Probable cause is a common sense, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.

*United States v. Vongkaysone*, 434 F.3d 68, 73-74 (1st Cir. 2006) (citations and internal punctuation omitted). A determination need not be "ironclad" or even "highly probable" to satisfy the standard of probable cause; it need only have been "reasonable." *United States v. Winchenbach*, 197 F.3d 548, 555-56 (1st Cir. 1999); *see also, e.g., Roche v. John Hancock Mut. Life Ins. Co.*, 81 F.3d 249, 255 (1st Cir. 1996) ("[O]ne who asserts the existence of probable cause is not a guarantor either of the accuracy of the information upon which he has reasonably relied or of the ultimate conclusion that he reasonably drew therefrom.").

In the circumstances presented, firefighters were not obliged to rule out every possible locale of the explosion that injured the defendant before inferring that it had occurred inside his house. The defendant's self-reports of an explosion, his obvious and serious injuries consistent with an explosion, his report to Stevenson, conveyed to Cunningham, that the explosion had occurred inside his house, the lack of any sign of an explosion outside of his house, the sound of hissing that probably, but not necessarily, was the sound of running water, and firefighters' sighting through the window of a blood trail inside consistent with the occurrence of the defendant's injuries therein, collectively sufficed to convey probable cause that there had been some kind of an explosion and that it had occurred within the house.

In the circumstances, firefighters reasonably perceived an emergency – an urgent need to enter the house to determine the origin of the explosion and to satisfy themselves that it presented no further danger, whether to persons or property. That there was no detectable sign of an ongoing process (for example, smoke or other damage) did not obviate the need for

examination, the firefighters having possessed probable cause to believe that an explosion recently had occurred within. *See, e.g., United States v. Klump*, 536 F.3d 113, 118 (2d Cir. 2008) (despite absence of smoke or flames, firefighters reasonably made warrantless entry of warehouse to investigate cause of odor that fire chief believed indicated something burning; "Nothing in the Fourth Amendment required them to wait until they saw actual smoke or flames to enter a building that they reasonably believed might be on fire."); *Finnigin*, 113 F.3d at 1185 ("The firefighters had an obligation to make sure the fire no longer presented a danger to the trailer and to the surrounding residences, and were not required to rely on Mr. Finnigin's obscenity-laced assertions that the fire was out.").

In short, Cunningham and the three volunteer firefighters who responded to the call for aid confronted "the need for a prompt assessment of sometimes ambiguous information concerning potentially serious consequences." *Beaudoin*, 362 F.3d at 66 (citations and internal quotation marks omitted). They need not have been certain that such consequences existed to justify their warrantless entry; indeed, they could not rule out their existence unless they entered.[13]

The First Motion accordingly should be denied.

## B. Second Motion

By way of his second motion, the defendant seeks to suppress statements made during the course of interviews conducted principally by Young at SMMC on June 25, 2010, on grounds that (i) he was subjected to custodial interrogation without benefit of *Miranda* warnings and

---

[13] The defendant cites *United States v. Struckman*, 603 F.3d 731, 744 (9th Cir. 2010), for the proposition that conjecture about what may or might have happened is insufficient to satisfy the government's heavy burden of proving exigent circumstances. *See* Replies to Government Responses to Defendant's Motions To Suppress ("Replies") (Docket No. 35) at 2. In *Struckman*, the government relied heavily, in attempting to show exigent circumstances, on an officer's testimony that once a suspect shed his jacket, he believed that the suspect intended to flee or fight the officers. *See Struckman*, 603 F.3d at 744. In this case, firefighters reasonably deduced, from objective facts, that an explosion had occurred in the defendant's home.

(ii) investigators failed to heed his unambiguous invocation of his Fifth Amendment right to remain silent and his Sixth Amendment right to counsel, continuing to question him after he invoked those rights. *See* Second Motion at 1. He also seeks to suppress evidence seized as a result of his purported consent to the search of his vehicle as fruit of the poisonous tree of the unlawful questioning. *See id*. at 1-2.

The government, which bears the burden of proving *Miranda* compliance, *see, e.g., United States v. Barone*, 968 F.2d 1378, 1384 (1st Cir. 1992), rejoins, *inter alia*, that the defendant never was in custody during the interviews in question, as a result of which no *Miranda* warnings were required and his purported invocation of his rights to remain silent and to counsel were inapposite, *see* Government's Objection to Defendant's Second Motion to Suppress Evidence ("Objection/Second Motion") (Docket No. 29) at 7-9. This argument is persuasive.[14]

The obligation of an officer to administer *Miranda* warnings attaches "only where there has been such a restriction on a person's freedom as to render him 'in custody.'" *Stansbury v. California*, 511 U.S. 318, 322 (1994) (citations and internal quotation marks omitted). Whether a person can be considered to have been in custody depends on all of the circumstances surrounding the interrogation, but "the ultimate inquiry is simply whether there [was] a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *Id*. (citation omitted).

"[T]he initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the

---

[14] The government alternatively argued, both in its papers and at hearing, that the defendant's purported invocation of his rights was ambiguous and, hence, ineffectual and that, even if it were unambiguous, Young appropriately did not continue questioning until the defendant clearly waived his invocation of those rights. *See, e.g*., Objection/Second Motion at 10-14. I need not and do not reach these alternative grounds for denial of the motion.

person being questioned." *Id.* at 323. *See also United States v. Quinn*, 815 F.2d 153, 157 (1st Cir. 1987) (relevant inquiry "is how a reasonable man in the suspect's position would have understood his situation") (citation and internal quotation marks omitted). "Among the factors to consider" in making a *Miranda* custody determination "are whether the suspect was questioned in familiar or at least neutral surroundings, the number of law enforcement officers present at the scene, the degree of physical restraint placed upon the suspect, and the duration and character of the interrogation." *United States v. Nishnianidze*, 342 F.3d 6, 13 (1st Cir. 2003) (citation and internal quotation marks omitted).

As counsel for the government noted during the hearing, this court has at least twice had occasion to consider whether a hospitalized suspect was "in custody" for *Miranda* purposes. In *United States v. Nanos*, No. 06-52-P-H, 2006 WL 3469633 (D. Me. Nov. 30, 2006) (rec. dec., *aff'd* Dec. 20, 2006), the court found it significant, in holding a police officer's initial interview of a hospitalized suspect non-custodial, that the officer (i) never told the suspect or implied to him that he was under arrest, but rather simply announced that he wanted to ask him questions about the suspect's own report of a dog attack, (ii) never touched the suspect, otherwise restricted his freedom of movement, or conveyed by display of weaponry or voice commands that the suspect was not free to leave, (iii) came alone to the hospital and stayed less than an hour, and (iv) separated the suspect's girlfriend from him only when the suspect and the girlfriend became irritated with each other, impeding the progress of the interview, and permitted the girlfriend to rejoin them when the suspect asked for her. *See Nanos*, 2006 WL 3469633, at *9.

In *United States v. Turcotte*, No. CRIM.01-74-B-S, 2002 WL 265108 (D. Me. Feb. 22, 2002) (rec. dec., *aff'd* Mar. 18, 2002), the court found two emergency-room interviews of a

defendant whose hand had been injured in a pipe bomb explosion non-custodial in circumstances in which (i) the defendant was noted to be calm, collected, and oriented to time, place, and person and to show no signs of impairment from an administration of morphine, (ii) the defendant initially was interviewed in an examination area for 15 to 20 minutes by an officer in plainclothes, accompanied by a uniformed officer, in circumstances in which doors and curtains to the room remained open and medical staff continued to move throughout the area, and (iii) the defendant was interviewed 20 minutes later in the same setting for approximately five minutes by a state fire marshal's office investigator, accompanied by the initial investigating police officer. *See Turcotte*, 2002 WL 265108, at *1-*2. The court concluded:

> The circumstances surrounding [the defendant's] interrogation were benign. . . . The interview took place under circumstances, discussed above, best described as nonthreatening and noninvasive. None of the police officers suggested at any point in time that [the defendant's] freedom would be restrained in any fashion. Medical personnel were freely coming and going during the course of both police interviews. As the government notes, the hospital was a neutral setting, over which the police exercised no control.

*Id*. at *4 (internal punctuation omitted).

At hearing, counsel for the government posited that the instant case is materially indistinguishable given that the defendant was coherent and responsive to questions, did not appear to be under the influence or impaired, and was never arrested, handcuffed, or restrained. Defense counsel rejoined that:

1. The defendant was not free to leave, whether because of police conduct or the necessity of immediate surgery. At the start of the first interview, Young underscored this fact to him.

2. The defendant understood, and a reasonable person in his shoes would have understood, that he was about to be charged with crimes, given (i) Young's revelations that

investigators had found marijuana and pipe bombs in his home, were sufficiently concerned about a suspicious battery in his car to secure the SMMC parking lot, and were aware of his criminal history and (ii) the presence in his room of two armed specialized agents, one from the fire marshal's office and one from the MDEA.

3.      Young stood between the defendant and the door, which was closed.

4.      Young exercised control by refusing to turn off the tape recorder.

5.      The defendant at one point asked the officers if he could have a cigarette and at another point if he could have a drink of water, suggesting that he viewed them as in control of the scene.

6.      The officers took the defendant's clothes, reinforcing the notion that he was not free to leave.

The government has the better argument.  Young expressly stated, and repeated during both interviews, that the interview was voluntary, that the defendant did not have to talk to him, and that the defendant was not under arrest or in custody.  Consistent with those statements, neither Young, Shaw, nor the two other law enforcement officers who were briefly present in the defendant's treatment room, Grimes and McMaster, handcuffed him, restrained his movement in any way, or controlled his environment.  Young and Shaw were in plainclothes.  While their guns would have been visible, they did not brandish them.  Nor did they impede hospital personnel from coming and going freely.  Indeed, a nurse was present during the second interview.  The interviews were relatively short, lasting 26 minutes and 21 minutes, respectively. While, during the second interview, Young arranged for McMaster to collect the defendant's clothes, he did so only after seeking and obtaining the defendant's permission to do so. *Compare, e.g., Nanos*, 2006 WL 3469633, at *10 (hospitalized suspect found to have been "in

custody" after officer had stripped him of his clothing without his consent, searched him for weapons, told him not to leave his room, and denied him contact with his girlfriend).

That the defendant understood that he *would be* charged with crimes, as would any reasonable person in his shoes, did not transform the interviews themselves into custodial interrogations. He had expressly been informed that he was not *then* in custody or under arrest and did not have to talk with investigators. While he was not free to leave the treatment room because of his serious injuries and imminent surgery, he could have chosen to send investigators away or otherwise refuse to talk to them. That he understood this is plain: shortly into the first interview, he did state that he might as well plead the Fifth Amendment and ask for an attorney.

While it is true that the defendant at one point asked Young and Shaw whether he could smoke a cigarette, no one else evidently was in the room at that time. Young and Shaw's responses indicated that they did not believe smoking was permissible at the hospital, not that they independently exercised authority over whether the defendant could smoke. Young merely conveyed the defendant's request for water and ice chips to a nurse, who fielded the inquiry.

In the circumstances, any inference of custody flowing from the closing of the treatment room door and/or Young's positioning between the defendant and the door during the first interview was effectively neutralized.

Finally, it is significant that, as in *Turcotte*, despite the defendant's pain and/or discomfort and the administration of morphine and lidocaine, he was at all relevant times coherent and responsive and showed no signs of mental impairment. Indeed, he was able at times to laugh and joke with investigators, was savvy enough to lie to them concerning the whereabouts of his car keys, and felt comfortable enough with them to invite Shaw to remain in his room in the interval between interviews.

The defendant was not, at any point, "in custody" during the first or second interviews.[15]

As the government suggests, *see* Objection/Second Motion at 7-9, this is dispositive not only of his claim concerning the failure to administer *Miranda* warnings but also of his assertion that officers failed to honor his unambiguous invocation of his rights to remain silent and to have counsel present, *see, e.g., McNeil v. Wisconsin*, 501 U.S. 171, 182 n.3 (1991) ("We have in fact never held that a person can invoke his *Miranda* rights anticipatorily, in a context other than 'custodial interrogation[.]'"); *United States v. Ellison*, No. 09-1234, 2010 WL 1493847, at *3 (1st Cir. Apr. 15, 2010) ("[E]ven if Ellison had clearly expressed a desire to speak with a lawyer, he could not have invoked any constitutional right to do that in a non-custodial interrogation conducted before he was formally charged."); *United States v. Vega-Figueroa*, 234 F.3d 744, 749 (1st Cir. 2000) ("In order for *Miranda* rights to be invoked, there must be (1) custody and (2) interrogation.").

The Second Motion accordingly should be denied.

### III. Conclusion

For the foregoing reasons, I recommend that both of the defendant's motions to suppress be **DENIED**.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which* <u>de novo</u> *review by the district court is sought, together with a supporting memorandum*

---

[15] The defendant cites *State v. Grant*, 2008 ME 14, 939 A.2d 93, for the proposition that a hospitalized suspect can be found to have been in custody when interviewed in a hospital room. *See* Replies at 4. *Grant* is distinguishable. The suspect in *Grant*, found by police at the scene of a car accident, was subdued with the use of considerable force, handcuffed, secured to a long board, and accompanied by police in an ambulance to the hospital. *See Grant*, 2008 ME 14, ¶ 28; 939 A.2d at 101-02. He remained handcuffed as he entered the hospital to undergo surgery and was subjected afterward to the persistent return of officers to his bedside. *See id*. at ¶¶ 28-30, 939 A.2d at 102.

*and request for oral argument before the district judge, if any is sought, within fourteen (14) days after being served with a copy thereof.   A responsive memorandum and any request for oral argument before the district judge shall be filed within fourteen (14) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to <u>de</u> <u>novo</u> review by the district court and to appeal the district court's order.*

Dated this 3rd day of January, 2011.

<u>/s/  John H. Rich III</u>
John H. Rich III
United States Magistrate Judge